IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2021

**IN RE BRANDON H.**

**Appeal from the Juvenile Court for Campbell County**
**No. 2019-JC-158    Amanda Sammons, Judge**

_____

**No. E2020-00713-COA-R3-PT**

_____

In this termination of parental rights case, Appellant/Father appeals the trial court's termination of his parental rights to the minor child on the ground of failure to manifest an ability and willingness to parent the child, Tenn. Code Ann. § 36-1-113(g)(14). While Appellant does not appeal the trial court's finding that termination of his parental rights is in the child's best interest, we are required to review that question. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

J. Wade Jenkins, Maryville, Tennessee, for the appellant, Douglas H.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Erica M. Haber, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

Brandon H. (d/o/b August 2005) (the "Child") was born to Appellant Douglas H. ("Father") and April H. ("Mother"). While living with Mother and the Child, Father physically abused Mother and physically and sexually abused the Child. During this time,

_____

[1] In cases involving a minor child, it is the policy of this Court to redact the parties' names to protect their identities.

the Child was also exposed to alcohol and drug abuse by both parents. In 2016, Father pled guilty to child abuse, neglect, and endangerment, for which he served six months in jail. Shortly thereafter, Mother and Father divorced. In November 2016, while Father was in jail, the Claiborne County Chancery Court entered a permanent parenting plan, which provided that Father and the Child have no contact until further order of the court. Despite the no contact order, Father continued to visit with the Child.

On February 1, 2018, the Department of Children's Services ("DCS") received a referral that Mother overdosed and was hospitalized. When DCS contacted Mother concerning the Child, she refused to provide DCS with Father's information. Therefore, on February 2, 2018, DCS filed a petition for temporary custody of the Child and an *ex parte* order in the Campbell County Juvenile Court (the "trial court"). The trial court entered an order granting DCS custody the same day, and the Child was placed in a foster home. Since entering foster care, the Child has consistently accused Father of physical and sexual abuse and has expressed that he does not wish to speak to or visit with Father.

DCS developed four permanency plans for this family. The initial plan, developed on February 22, 2018, required that Father: (1) complete an alcohol and drug assessment; (2) complete a mental health assessment and follow recommendations; (3) complete a domestic violence class; (4) complete a parenting class; (5) maintain a stable income; (6) maintain stable housing; and (7) maintain stable transportation. DCS revised the permanency plan on June 26, 2018 with the added requirements that Father complete: (1) a six-month batterer's intervention program; and (2) a psychological evaluation.[2] DCS revised the permanency plan twice more, but the requirements for Father remained the same. Although DCS worked with both Mother and Father, Mother died during the pendency of this case. Accordingly, this opinion concerns only Father's actions and the termination of his parental rights.

On July 11, 2018, the trial court adjudicated the Child to be dependent and neglected, in part, due to Father's substance abuse and "improper guardianship for exposing the Child to domestic violence." Around the same time, the trial court entered another no contact order between Father and the Child.

Despite DCS' efforts, Father failed to complete any of the requirements under the permanency plan. Accordingly, on August 13, 2019, DCS filed a petition to terminate Father's parental rights on the grounds of: (1) substantial noncompliance with the permanency plan; and (2) failure to manifest a willingness and ability to assume custody or financial responsibility of the Child. DCS also alleged that terminating Father's parental rights was in the Child's best interest.

---

[2] This plan also required Father to complete a psychosexual assessment, but the trial court removed this requirement at ratification because it was too costly.

The trial court heard DCS' petition on February 14, 2020, and the following witnesses testified: (1) Natasha Sharp, Father's DCS case worker; (2) Riley Long, the Child's care coordinator and case manager at Camelot Care Centers ("Camelot"); and (3) Father. DCS entered several exhibits into evidence including the underlying dependency and neglect case file and the permanent parenting plan from Mother and Father's divorce.

By order of March 5, 2020, the trial court terminated Father's parental rights on the ground of failure to manifest a willingness and ability to assume custody or financial responsibility of the Child.[3] The trial court also found that termination was in the Child's best interest.[4] Father appeals.

## II. Issues

Father's sole issue on appeal is whether the trial court erred when it found that Father failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child.

Although Father does not challenge the trial court's finding that termination of his parental rights is in the Child's best interest, the Tennessee Supreme Court has instructed this Court to review same. *See In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016). Accordingly, we will also review the trial court's finding that termination is in the Child's best interest.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*,

---

[3] Although Father failed to complete any permanency plan requirements before DCS filed the petition to terminate his parental rights, the trial court found that Father eventually substantially complied with same. Accordingly, the trial court found that DCS failed to prove that Father was in substantial noncompliance with the permanency plan.

[4] After the trial court entered its order terminating Father's parental rights, DCS filed a motion asking the trial court to clarify its ruling. Specifically, while the trial court found that Father failed to manifest an ability and willingness to assume custody of the Child, it cited Tennessee Code Annotated sections 36-1-113(g)(9)(A)(iv), and (v) as authority for this ground. However, sections 36-1-113(g)(9)(A)(iv), and (v) apply to putative fathers, which Father is not. Rather, Tennessee Code Annotated section 36-1-113(g)(14) is the correct statute for the failure to manifest an ability and willingness ground. Accordingly, the trial court granted DCS' motion, and corrected its order to provide the proper statutory citation.

303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E*., 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E*., 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522-23 (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H*., 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H*., 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo

with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Furthermore, if the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Therefore, this Court "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837). Here, the trial court made specific findings that Ms. Sharp, Father's DCS case worker, and Ms. Long, the Child's care coordinator and case manager, were reliable and credible witnesses. The trial court made no credibility finding as to Father. Accordingly, we defer to the trial court concerning Ms. Sharp's and Ms. Long's respective testimonies.

### IV. Failure to Manifest an Ability and Willingness to Assume Custody of the Child

The trial court found, by clear and convincing evidence, that Father's parental rights should be terminated under Tennessee Code Annotated section 36-1-113(g)(14), which provides for termination when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground required DCS to establish two separate elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). First, that Father "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the [C]hild.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, that placing the Child in Father's legal and physical custody would "pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." *Id.* We examine each element below.

This Court was recently split over the proper interpretation of the first prong of Tennessee Code Annotated section 36-1-113(g)(14). The split concerned whether a parent must fail to manifest both an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest either an ability or willingness to assume custody and financial responsibility. *Compare* ***In re Ayden S***., No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) with ***In re Amynn K***., No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Recently, in ***In re Neveah M.***, No. M2019-00313-SC-R11-PT, 2020 WL 7258044 (Tenn. Dec. 10, 2020), the Tennessee Supreme Court found that "the expressed legislative intent for section 36-1-113(g)(14) is to require clear and convincing proof that a parent or legal guardian was <u>either</u> unable or unwilling to personally assume legal and physical custody or financial responsibility of a child." *Id.* at *14 (emphasis in original). Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing ***In re Amynn K.***, 2018 WL 3058280, at *13) (emphasis in original).

Father urges this Court to consider his compliance with the permanency plan as proof that he is willing and able to assume custody of the Child. Although we acknowledge that Father completed some of the plan requirements,[5] we note that "permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." ***In re C.S., Jr., et al.***, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* While compliance with a permanency plan may provide proof of a parent's actions, compliance does not, *ipso facto*, prove that a parent has manifested an ability or willingness to assume custody of a child. Indeed, this case presents an excellent example of why this is so. As discussed, *infra*, despite Father's compliance with some permanency plan requirements (namely his participation in alcohol and drug treatment, domestic violence counseling, and a psychological evaluation), Father ultimately failed to acknowledge, let alone remedy, the core reason for the Child's removal, i.e. Father's abuse. Accordingly, despite completing some requirements under the plan, Father still failed to place himself in a position to provide the Child with a safe, stable, or appropriate home.

---

[5] We render no conclusion regarding whether Father was in substantial compliance or noncompliance with the permanency plan.

*Id.*

The trial court agreed and found, not only that Father abused the Child, but also that Father's refusal to admit such abuse demonstrated his failure to manifest an ability to assume custody of the Child, to-wit:

> The [c]ourt found that [Father]'s omission to acknowledge the no contact order put in place by the Chancery Court of Claiborne County on or about November 18, 2016, and his omission to acknowledge any sexual or physical abuse towards the [C]hild perpetrated by him demonstrates that [he] has failed to manifest any ability to assume custody of the [C]hild.

However, the trial court noted that "[Father's] willingness to assume custody was in his favor."

As an initial matter, the record supports the trial court's finding that Father abused the Child. Ms. Sharp, Father's DCS case worker, testified that "[t]he [C]hild has disclosed physical and sexual abuse by [Father] and has remained consistent in the last two years in saying that he does not want contact with his father." Similarly, Ms. Long, the Child's care coordinator and case manager with Camelot, testified that the Child has no desire to speak with Father and was "very comfortable with th[e] no contact order being in place."

The record also supports the trial court's finding that Father denies any abuse. Despite Ms. Sharp's and Ms. Long's respective testimonies, and despite Father's 2016 guilty plea to child abuse, neglect, and endangerment, at trial, Father continually denied any abuse. When questioned as to why he was charged with these crimes, Father blamed his daughter and son, testifying that the children lied, and that Mother (to whom he was married at the time) "set [Father] up" to be arrested. In a similar denial of abuse, Father testified that he pled guilty, not to admit to the abuse, but to avoid the three to five-year jail sentence a conviction carried. In this regard, Father clearly is unable to admit his to actions, much less address and cure his propensity for abuse. The record also shows, through Father's own testimony, that he violated the 2016 no contact order by continuing to visit the Child.

We agree with the trial court that Father's behavior wholly prevents him from assuming custody of the Child. However, we conclude that Father's conduct demonstrates his unwillingness, rather than his inability, to do so.[6] Although Father testified that he loves his son and "would do anything to have him home," "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, 2018 WL 5310750, at *5.

---

[6] When determining whether a parent has demonstrated an ability to assume custody, courts focus on a parent's lifestyle and circumstances. *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) (citing *In re Maya R.*, 2018 WL 1629930, at *7; *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)).

Specifically, courts examine whether the parent has "attempt[ed] to overcome the obstacles that prevent [him] from assuming custody or financial responsibility [of] the child." ***Id.*** As discussed *supra*, while Father complied with some aspects of the permanency plan, he never addressed the obstacle that prevented him from assuming custody, i.e. his abuse of the Child. Although Father claimed to desire a relationship with the Child, he made no attempt to pursue one in a manner that was healthy and safe for the Child. Rather than confess to the abuse and engage in therapeutic counseling to address it, Father simply denied it. Father's complete disregard for creating a safe, healing, and positive environment for the Child "negated his professed willingness to parent." ***Id.***

Turning to the second prong of analysis, the trial court found, by clear and convincing evidence, that placing the Child in Father's care "would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." Tenn. Code Ann. § 36-1-113(g)(14). Regarding what constitutes "substantial harm," we have explained before that

> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

***In re Maya R.***, 2018 WL 1629930, at *8 (quoting ***Ray v. Ray***, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found that, because Father abused the Child, "placing the [C]hild in [Father's] custody would place the [C]hild in physical and psychological jeopardy." We agree. To place the Child in the home of his abuser, who denies any wrongdoing and whom the Child has not seen in over two years, would likely cause substantial harm to the Child's physical and psychological welfare. In addition to further physical abuse, Father's unwillingness to admit past abuse and his blaming of the children for his own actions, would likely present a significant risk of continued emotional abuse. Accordingly, we agree with the trial court that Father failed to manifest an ability and willingness to assume custody of the Child. We now turn to the best interest analysis.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the

parent's rights is in the child's best interest.  ***In re Bernard T.***, 319 S.W.3d at 606 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 809).

> As the Tennessee Supreme Court explained:
>
> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." ***In re Kaliyah S.***, [455 S.W.3d 533, 555 (Tenn. 2015)] (citing ***In re Audrey S.***, [182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)]).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." ***Id.*** When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." ***In re Audrey S.***, 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. ***Id.*** "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d)(2017).

***In re Gabriella D***., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case.  As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> ***
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent

or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

***

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994).

Concerning the first and second factors, *see* Tenn. Code Ann. § 36-1-113(i)(1) and (2), the trial court found that Father

has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [C]hild's best interest to be in the home of [Father]. [Father] has failed to acknowledge any improper behavior on his own part, along with the [C]hild's steadfast contention that [Father] has physically and sexually abused him.

***

[Father] has failed to make a lasting adjustment even after reasonable efforts made by [DCS]. Although . . . [Father] has been substantially compliant with everything [DCS] has told him to do, [Father] has not acknowledged the root

- 10 -

cause of the problem to overcome any obstacles.

As discussed, *supra*, the record supports this finding. To create a home that was safe and suitable for the Child, Father had to first admit that he abused the Child. Despite the fact that DCS provided Father with mental health services and domestic violence classes, which he completed under the permanency plan, Father continued to deny any abuse. His refusal to acknowledge his actions and the effect of those actions on the Child demonstrates: (1) Father's disregard for the Child's safety and wellbeing; and (2) Father's unwillingness to change his harmful behaviors. Accordingly, it is neither safe nor in the Child's best interest to return to Father.

As a result of Father's abuse, the trial court found that Father and the Child do not have a meaningful relationship, *see* Tenn. Code Ann. § 36-1-113(i)(4), and "have not [had] any contact since the inception of this case in 2018 . . . ." Indeed, at trial, Father admitted that he has not had contact with the Child in over two years, and he could not recall the last time he had a strong relationship with his son. As discussed, *supra*, both Ms. Sharp and Ms. Long testified that the Child, who is now fifteen years old, has no interest in speaking to or living with Father. Clearly, Father's abuse and his denial of same have extinguished any desire the Child might have had to re-establish a relationship with Father. This factor weighs heavily in favor of termination.

The Child's enmity toward Father supports the trial court's finding that removing the Child from his current foster home and placing him with Father would have a detrimental effect on the Child. *See* Tenn. Code Ann. § 36-1-113(i)(5). Although the trial court found that the Child has struggled in foster care, it noted that foster care has been "better for him as far as stability and safety, versus going home to face . . . someone who might be abusive." We agree, and the record supports these findings. Ms. Sharp testified that she believes it would be detrimental to remove the Child from his foster family because, while foster care has been difficult for the Child, he is doing well in his current placement and is bonded with the family. Similarly, Ms. Long testified that the Child's foster family "are really great providers for [him] and he really identifies them to be great support people in his life." Indeed, to remove the Child from a stable, supportive, and loving environment, and to place him in the home of his abuser, would undoubtedly have a detrimental effect on him. This factor weighs heavily in favor of termination.

Concerning the sixth factor, the trial court found that termination of Father's parental rights was in the Child's best interest "because [Father] has shown brutality, physical, sexual, emotional[,] or psychological abuse or neglect toward[] the [C]hild . . . " and Mother. *See* Tenn. Code Ann. § 36-1-113(i)(6). As discussed, *supra*, the record supports these findings. Although Father denies any abuse, he pled guilty to child abuse, neglect, and endangerment, which "constitutes an admission of all facts alleged." ***State v. Smith***, 996 S.W.2d 845, 847 (Tenn. Crim. App. 1999). Further, despite Father's denials, the Child has consistently maintained that he was physically and sexually abused by Father.

- 11 -

Accordingly, this factor weighs heavily in favor of termination.

Although Father made consistent child support payments during the pendency of this case, *see* Tenn. Code Ann. § 36-1-113(i)(9), this is the only factor that weighs against termination of his parental rights. This one factor, however, is not sufficient to overcome the other factors, discussed *supra,* that weigh in favor of termination. Father not only abused the Child, but he has consistently refused to accept any responsibility for his wrongdoings, all of which have caused the Child great distress. According to the record, when the Child was initially placed in foster care, he spent several months at an in-patient treatment facility for behavioral issues. Although the Child has made noticeable improvements, he is currently engaging in a "trauma narrative" in therapy. He receives weekly intensive case management, and he receives medication management from Camelot to address the underlying trauma from Father's abuse. Understandably, the Child has no desire to have a relationship with Father. He is bonded with his current foster family and, although the foster home was not originally a pre-adoptive home, the record shows that, since Mother's death, the family has considered adopting the Child because "they really do care a lot about [him] and want the best for him." To remove the Child from this stable home and to place him with his abuser would most certainly cause the Child further distress. Accordingly, from the totality of the circumstances, there is clear and convincing proof to support the trial court's finding that termination of Father's parental rights is in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's termination of Appellant's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Douglas H. Because Douglas H. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong  
KENNY ARMSTRONG, JUDGE